Thank you very much. No Hair Argument in Alaska Electrical Pension Fund v. Pharmacia Thank you. Thank you very much, Your Honor. Good morning, Your Honors. Again, I'm Jonathan Hoff, Representative of Defendants Appellants. I will start off with a totally predictable question for you. If the plaintiffs were not on inquiry notice on what we had before us in Merck, how can we find that the plaintiffs were on inquiry notice here prior to the Washington Post article? I was going to address that exact point before you asked it, Your Honor. Merck actually works for us if you go through the facts and compare it to the facts in our case. What happens in Merck is there is the VIGR trial, which compares Vioxx to naproxen. The result of that is that there is a higher incidence of cardio events in the Vioxx patients than in the naproxen patients. It's not clear whether that is because naproxen is good for the heart or whether Vioxx is bad for the heart. What's in the public domain is a lot of reports and discussions about is it the naproxen hypothesis? In other words, is naproxen better? And we don't know. It's kind of what we have here, though. No, not at all. Not at all, Your Honor. Let me finish. Merck goes around and says, hey, we don't know, but we think that the more plausible explanation is that naproxen hypothesis is what accounts for the differential in heart events. And then in 2003 comes out this Harvard study that says, nope, contradicting that naproxen hypothesis, really Vioxx. What the court holds in Merck is that the plaintiff's claim is that Merck went around saying that the naproxen hypothesis was the most plausible explanation when in fact it knew it was not, and it was really Vioxx that was causing the problems. And the court holds that prior to the October 2001 time delineation that the district court used as the starting point for storm warnings, there was nothing in the public domain that contradicted Merck's position that the naproxen hypothesis was plausible. It was not until the Harvard study comes out in 2003 that says, no, that's wrong, it's Vioxx. And the claim is you knew this all along. In our case, the JAMA article is the functional equivalent of Merck's going around saying it's the naproxen hypothesis that's plausible. But the JAMA article was fraudulent. So they claim. So they claim. That's the allegation. Absolutely. And that wasn't known. There's nothing that says that it was fraudulent until the Washington Post article came out. I beg to differ, Your Honor. All right, what is the evidence that anyone questioned Pharmacy is Good Faith or its motive regarding its interpretation of the class study, the JAMA article, or the use of truncated data before the Washington Post article? What is the evidence of fraud? First of all, that's not what Merck holds, and I'll come around to answer that question. There's nothing in Merck when anyone said they're committing fraud. What happened was there was evidence that was – Where is there any questioning of your good faith? Where is there any questioning of your motive prior to the Washington Post article? There hasn't been ever any disclosure of facts, even the British Medical Journal article and the Washington Post. There has never been any disclosure of facts. So how were they on inquiry notice before the Washington Post article? Because they were on notice that there was now information in February of 2001 contradicting the JAMA article. And that's all that happened in Merck. On a scientific level, but not in terms of fraud. Same in Merck. Same in Merck. There was nothing – I looked at this carefully last night. There was nothing in Merck that says that they committed fraud. It says that there was information in the Harvard study that contradicted the prior statements of an approximate hypothesis. And there are no facts that show there's fraud. And, in fact, one convenient fact the plaintiffs ignore constantly is that one week after the British Medical Journal article came out, the FDA says, you know what, we are going to change the label because of class, because of the class study. No, but they changed it for a different reason. There is testimony in the record that it's less favorable – you'd be better off without it. Oh, no. Without that change. No. There's testimony in the record. But the point, Your Honor, is that the basis upon which the FDA changed the label was not on the basis of the original protocol. And, remember, we disclosed – Pfizer – Pharmacy, rather, disclosed – It wasn't the change you were looking for. Yes, but my point is that the FDA said there's another way to look at this data that's not on the original protocol, and that's not fraudulent. But there's never been any disclosure ever that established the bad motives of the defendants. Well, that's your defense at trial, if we get to trial. No, but in the public domain. In the public domain, there's never been. And, in fact, let's look at the Washington Post. It's a fraud case. There's supposed to be an inquiry notice of fraud, not of a scientific dispute. That's what I'm – what is the evidence of fraud? The evidence has to – as I read, Merck, the evidence has to be, is there information that goes into the public domain that contradicts the prior statements of the defendant? And that's what you have here. Harvard study versus Naproxen hypothesis, JAMA article versus the FDA Advisory Committee. And if you look at the allegations in the complaint of what the fraud is, the fraud is all the things that would be criticized for in terms of the facts that come out in the FDA Advisory Committee process. Let me ask you this. Yes, ma'am. I thought one of the interesting things at Merck was the efforts of Merck to dissipate the doubt. And I thought we had something similar in this case, efforts by Pharmacia to dissipate the doubt. The difference is that in Merck there was nothing in the public domain that could counteract what Merck was saying because the information in the public domain was we don't know whether it's the Naproxen hypothesis or the Vioxx that's bad. And so Merck kept promoting the plausibility of the Naproxen hypothesis. Here you have clear information from the FDA staff and the FDA advisory saying you're wrong. We disagree with you. We think you're wrong. And so there's nothing that requires the defendants to say, oh, well, we committed fraud. There's nothing that requires that. I am looking at the statements that were made in February, the statements that say things like this is invalid. You don't just look at six months of data. This is a labor. It sounds to me like something funny is going on. But Judge Berry is asking you, isn't that really just – about whether you look – at what point you can validly look at the data, where you can segregate it, and there's a lot of different reasons to segregate it. How does the public know at that point that they should be making inquiries? Well, I'll answer that in a couple of ways. One, because if you look at the allegations of misrepresentations in the complaint, they are identical to the facts that are disclosed in the February 2000 timeframe, not the sort of tagline conclusions, invalid or whatever. It's that you select the – Truncated results. No, no, no. It's very – their allegations are very technical, scientific technical. They say that you use this informative censoring and things like that that are very technical. But those facts come out very clearly in the FDA staff report. Not just the taglines about invalid, but exactly what the JAMA article was based on. And then they reject the analysis in the JAMA article. So you can't just go to a tagline. You have to look at the facts that are disclosed in all of them. If you compare the allegations of misrepresentations in the complaint with the facts that are disclosed in the February 2000 proceeding, you will see they are identical. It was all laid out there. And the Washington Post article was a very interesting one. If the information – what prompted the Washington Post article? It was the information that was disclosed in February of 2001. If that information was provocative enough – No, but it talked about intentional malfeasance. That's – That's what the Washington Post article – It talked about the allegation that Pharmacia had withheld the full class study data and trumpeted the results and withheld it from the editors of JAMA. That a level of trust was broken. It's quoting the JAMA editor. And after that, Pharmacia continued to defend its decision. I want to ask you this question. It was not enough in Merck that the FTA had publicly rebuked the company, calling its representations, quote, false, lacking in fair balance, and minimizing the potentially serious cardiovascular findings, end quote. It was not enough for inquiry notice that consumer suits had been filed. It was not enough that news and academic publications were discussing Vioxx's potential cardiovascular effects. Why, if it wasn't – if all of that wasn't enough in Merck, how can you argue that what little you have here, a couple of phrases in the staff reviewer's report or word, is enough? Okay, Your Honor, I said it a couple of different ways. One, the last point you made, it's not a couple of words. It's an entire factual presentation. A scientific – But the point is that the facts that become the basis for the allegations of misrepresentation are laid out in detail. It's not the tagline. That's number one. Number two, in the Merck case, all that the FDA did was to say, you know what, you guys are talking to these healthcare professionals, and the fact that you're saying that the niproxen hypothesis is the most plausible and you're pushing that without telling them what you've already agreed is that there's also a possibility that Vioxx is the cause, and that's what they had the problem with. Our issue is not that the FDA put something premature or not imprimatur. Our issue is that the facts were disclosed in the proceeding and were widely disseminated, and this business about how, you know, a reasonable investor doesn't have to be on notice of everything that goes into the marketplace is inconsistent with the efficient market theory. That's just blatantly inconsistent with all of security's laws. Well, the FDA warning letter, that's a final agency action. But all they were saying was, keep it balanced. Keep your marketing to healthcare professionals balanced, and there were some isolated incidents of that. That's not the same thing as contradictory information coming out in the FDA letter. The FDA didn't say, hey, you can't say that the niproxen hypothesis is a possibility because you know that Vioxx is the killer. They didn't say that in those letters. They said it was all in the public domain. It wasn't until the Harvard study came out in 2003 that there was contradictory facts that came out, and that's what put people on inquiry notice. Now, in the Washington Post article, Your Honor, the point I was making was a slightly different one than where you were going. The point I was making was, what was it that prompted the Washington Post article? It was what came out in February of 2001. If the information in February of 2001 was so provocative that it caused the Washington Post to go call up Dr. Wolf, who talks to anybody, they called up the JAMA editors to find out. And they were able to figure out whatever it is they figured out by August of 2001. It only took them a couple of months to do that. That's what inquiry notice is about, Your Honor. Inquiry notice as to a securities fraud claim. That's what Merck kept repeating must be the focus. Yes. And the securities fraud is there were alleged misrepresentations, information in the public domain in February of 2001 that contradicted the statements that were being made by the defendants beforehand. And then the question is, okay, well, what do you have to do to make the inquiry? In this case, these particular plaintiffs sent all their brokerage statements, came out in discovery to the plaintiff's law firm so they can find the cases for them. And that's what happens in the real world. And if the Washington Post saw a red flag to go and find out and talk to people, then if I'm an investor and I hear in the FDA process that, hey, you guys were telling me that Cellebrex was safer, and here's the Chicago Tribune headline on February 8th of 2001. Bear with me a second. Tests failed to show Cellebrex drugs safer than rivals. The claim was? It doesn't mean it was fraud. It's a storm warning, Your Honor. That's what we have to keep our aisle. Where is it ever going to be disclosed that somebody is a fact, a fact, not an opinion? And if you look at the BMJ article, all the guy says is actually says the opposite. He says we can't understand why they would say these things if they knew that they were the case. But they don't say that they're fraudulent. Why was that headline? Because Pharmacia was alleged in the Washington Post article to have withheld the full class study data. But you knew that if you looked at the information that came out in February 2001. It was clear as a bell. Everybody said in that process, not the taglines, read the transcripts, read the report. And the bias? What about the bias, the alleged bias? The reason they didn't include the last seven months of the 13-month study? That was all in the staff reports. All those, because they took each of the rationales that Pharmacia advanced and then go down the checklist and disagree with you. It had nothing to do with fraud. It could have been a legitimate dispute as to the analytical model of the class study. And it still is to this day. And nothing that the BMJ article said, nothing that the Washington Post article said is to the contrary. Let me ask you this. Yes, Your Honor. I see three things that allege that these reports were not proper, that they improperly segregated data. And that was FDA, Bloomberg, and J.P. Morgan. Are they required to have looked at all of those three things or all of them, any of them? Okay. Who is it that they require? A reasonable investor. Yes. Can we put it, impute it upon their heads? Absolutely. This claim is brought on the fraud on the market theory. It is based on the assumption that all material information is known to the marketplace and that all stocks are affected by everything that's in the marketplace about that stock. And if you look at the Sattel case, any number of cases in the United States Supreme Court, the basic versus Levinson, you go back to that, that gets imputed into the stock price. And all investors are deemed to know about them in order to overcome the reliance requirement and also be deemed to know about them in terms of the storm warnings concept. You don't have to be on top of everything. And just as an irony here, what the plaintiffs are claiming is that the JAMA article was false. The JAMA article is more technical than anything you're going to read. As I see your argument, your argument kind of is that, look, everything there was to know was basically out there in February or a good warning of it. And the reason is there's not more later is there is no more. That if we go, if this case goes further, we're not going to find, there's not much more. That's right. That's your argument. That's one of them. But, yeah, that's a very important piece. Of course, we're not talking about internal stuff now. We're only talking about publicly. You say essentially the public. It has to be public. That's the whole concept here. But, you know, the cases are absolutely 100% clear. My colleague respectfully is just wrong on this. The market absorbs all information. Investors are deemed to know about it whether they have actual knowledge or not. So they're deemed to know about pharmacy via lulling statements, and they're also deemed to know about all the buys, the buy proposal recommendations. Let me comment on the buy recommendations. And the strong buys. The buy recommendations are, if you look at what those mean, what those mean is that the analysts have 12-month projections on what they think the stock price range is going to be. And as long as when they adjust their models to account for, you know, additional projections on performance, as long as their models show that the stock price is going to go within that range, they maintain the rating. Ratings are not as – But you can take issue with them, but that's out there, too. But then the stock price dropped like it didn't drop in Merck. The information prior to October 2001 did not cause any stock movement whatsoever. Here we had, according to the plaintiffs, a 9% stock decline. That should put you on an inquiry notice. So if the stock drops in February and not after, I would assume that once that information is in there, why wouldn't you have a buy? I'm not – I don't – Well, if all the bad information is already out there, then why wouldn't you have a buy recommendation? Because the value of the stock is already down. That's a softy to you. Maybe I'm not answering it right. You know what? I mean, I could say, oh, absolutely, that's right. But, I mean, the real answer is that the securities analysts have models and projections and they don't go – and the buy – and if you read the back of your analyst report that gives you explanations of those things, it's really not meaningful. When you talk to any sophisticated investor, they will say – and, you know, the people that actually are the clients of those research analysts, they'll say, I don't care what their recommendations are. I want to look at their insights and what facts they know and how they analyze the performance of the company going forward. The buy recommendations, you know, are not particularly meaningful. Rebuttal. Thank you. Thank you, Your Honors. Counsel, out of curiosity, we know when you say the statute of limitations did not begin. When did it begin? It began within two years of when we filed suit. Quite frankly, it doesn't matter much. What started the statute of limitations, exactly? Possibly August 5th, possibly the Juney article. Either one you can make a case for. But it really doesn't matter because our lawsuit is probably going to strike either way. And what was so different about those things from the February? Well, what is so different is that in February, it looks like it's a legitimate scientific disagreement, and it looks, quite frankly, like Pharmacia has JAMA on its side. The world's most prestigious peer-reviewed medical journal is on their side. Now, nobody is going to think that it's fraud when JAMA is endorsing their interpretation. Nobody is going to think it's fraud until they find out that JAMA wasn't given the full data and that the JAMA editors didn't know what was there and that they were curious that it wasn't given to them. Nobody knows back in February that the people at Pharmacia signed statements indicating that they were given all of the documents. It's reported later on in Businessweek within two years of when we filed suit that they didn't hand them over, and that's deliberate misconduct. Nobody knows there's deliberate misconduct back in February. In February, it looks like there's two interpretations of the data. The six-month interpretation is Pharmacia's, and it is so powerful and so compelling that JAMA published it. That's what it looks like back then, and that does not scream fraud. That doesn't even suggest fraud. It doesn't even hint fraud. Can you tell from the JAMA data that it's only six months' data? From the JAMA data, yeah, you can tell it's only six months. You can tell it's only six months, and you've got these things in February saying it's only six months. FDA doesn't like that. This is invalid. This is unjustified. You know that there was a 13-month study. You know that Pharmacia has said it's the first six months of this study that are valid and that make the point, and that's what JAMA chose to prove. You don't know JAMA didn't have this whole story at that point, Your Honor. The statements by Pharmacia that people were allowed to leave and did leave after six months is why you don't look at the stuff after six months, but that's enough to dissipate warnings, or are you just not relying on dissipation? Are you relying on dissipation? The objectively reasonable investor could look at Pharmacia's statements and say, okay, that sounds legitimate, and JAMA bought it. If it's good enough for JAMA, why isn't it good enough for me? Why would I suspect fraud? Okay, can I just answer my question? My question was, are you relying on the fact that after the February information was out there that Pharmacia made statements that dissipated any obligation to make inquiry known? I don't think the obligation to make inquiry arose, but yes, I am relying on those statements to say that the reasonable investor would not have suspected fraud, and if they thought, well, maybe I'll be a little bit suspicious, that dissipated it. Yes, absolutely. Their argument is there weren't any, but assuming arguender there were, they were dissipated. They were dissipated. Alternate argument. You see, well, Pharmacia had an explanation for what they did, and they stuck to it, and they continued to explain it, and the objectively reasonable investor of ordinary intelligence, not a medical doctor, not somebody who has tremendous expertise in these fields, is going to think, yeah, that sounds legitimate, and most medical doctors are going to assume that JAMA saw the full data and agreed with Pharmacia to truncate it. That's quite frankly what was going on there. The standard, according to Merck, is that the facts constituting inquiry notice must be sufficiently advanced beyond the stage of a mere suspicion, which is the most you can argue for here in February, sufficiently confirmed or substantiated not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit. We have nothing. The reasonable investor isn't me, but the reasonable investor is people who invest in the market, including the people in stock analysts who are experts in the drug stuff and follow it, and that for their clients, they would be looking into these things if they were storm wards. I don't think you can impute that kind of expertise, and you also can't make the argument that opposing counsel... Isn't that what goes into the market? It goes into the market, but Basic against Levinson and the fraud in the market principle is based on the fact that you don't expect the objectively reasonable investor to be aware of all the statements, all the potential misrepresentations that can affect market price. The Supreme Court's holding in Basic is that even if the reasonable person is unaware of that, they can reasonably rely on the integrity of the market. It is not something that imputes knowledge of all those things to anybody. It excuses the investor of proving individual knowledge because... But isn't the market working pretty good here? I mean, when the stuff came out in February, the stock went down. The stock went down because the FDA said, we're not persuaded, and we're not going to give you the label change. You'd expect the stock to go down, absolutely. That doesn't indicate fraud. It's not true that every time the stock goes down, it's because of a fraud, Your Honor. But you can have inquiry notice without a drop in stock price, according to Merck. Yes, you can. And you can have no inquiry notice with a tremendous stock drop. There are a lot of cases that hold that. It kind of depends on whether the problem is saying something affirmative or hiding something. It depends on whether the problem looks like a fraud, quite frankly, and this did not look like a fraud in February, Your Honor. Well, any further questions? Thank you very much. Very well argued. Thank you very much. Have a good weekend. I'm sure you're all going to use it after arguing this case. We will take the case under advisory.